

# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | **WD85232** |
| Respondent, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| ERIC J. DEVALKENAERE, | ) | **October 17, 2023** |
| | ) | |
| Appellant. | ) | |
| | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable J. Dale Youngs, Judge**

**Before Division Two: W. Douglas Thomson, Presiding Judge,
Thomas N. Chapman, Judge, and Janet Sutton, Judge**

Following a bench trial in the Circuit Court of Jackson County, Eric Devalkenaere ("Devalkenaere") was convicted of involuntary manslaughter in the second degree and armed criminal action. He appeals. The judgment is affirmed.

## Background

In criminal cases, we view the evidence in the light most favorable to the verdict. *State v. Hendricks*, 619 S.W.3d 171, 173 n.1 (Mo. App. W.D. 2021). Under this standard, we accept as true all evidence tending to prove guilt along with all reasonable inferences that support the verdict, and we disregard evidence and inferences contrary to the verdict. *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015).

On December 3, 2019, A.H., T.S., and Devalkenaere were working as detectives for the Kansas City, Missouri Police Department in the Violent Offender Squad. These detectives wore plainclothes and drove unmarked vehicles that were not equipped with lights and sirens. KCPD policy prohibited members of the Violent Offender Squad from using their unmarked vehicles in a pursuit.

On December 3, 2019, A.H. was in his vehicle and exiting a parking lot on 43rd Street when he saw a maroon-colored Mustang moving eastbound toward him at a high rate of speed. A red pickup truck followed the Mustang at a high rate of speed. The vehicles went through a green light at the intersection of 43rd and Cleveland heading eastbound. A.H. did not call for uniformed officers to stop the vehicles, but he did report to dispatch that there was a red truck chasing a maroon-colored Mustang. A.H. was unable to report a make or model of the red truck. A.H. wondered about the location of the police helicopter that day and mentioned that the two vehicles almost caused several accidents. The police helicopter responded that it was above 35th and Hardesty and asked for A.H.'s location. A.H. mentioned that he was at 43rd and Spruce and that the vehicles that he had previously seen were going fast.

Officer E.V. was conducting surveillance in the police helicopter. Per KCPD policy, the police helicopter does not engage in pursuits. Approximately 86 seconds after the red pickup had passed A.H. going eastbound on 43rd Street, E.V. reported that he saw a red pickup going westbound on 45th. At this time there were numerous red pickups in the area. E.V. reported that the red pickup on 45th street was speeding, and that it was

2

going to run a red light and go northbound.[1]  E.V. reported that there was not a Mustang around the red pickup.  E.V. believed that there was reasonable suspicion, but not probable cause, that the red pickup going westbound on 45th street was the same pickup that A.H. had seen.[2]

A uniformed tactical officer reported to the police helicopter that he saw a red truck drive past him and that the driver of the red truck was a black male driver with a bright blue shirt and a stocking cap.  This officer did not attempt to make a stop of the red pickup.

At some point, Devalkenaere briefly followed the truck and reported the license plate of the truck to dispatch.  Devalkenaere made no attempt to stop the truck.

E.V. continued to monitor the red pickup from the helicopter.  The red pickup stopped at a residence on College Street.  At that time, no police officer had attempted to stop the red truck.  The red pickup slowly positioned itself in the street to back into the narrow driveway of the residence.  The red pickup then began very slowly backing into the driveway.  The red pickup spent approximately 90 seconds slowly turning around in the street and backing down the driveway.  It then turned into the backyard of the

---

[1] Video footage from the police helicopter was introduced as an exhibit at trial.  The footage did not capture the reported speeding on 45th Street.

[2] Probable cause must be particularized: "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

residence. No attempt was made to stop the red pickup while it was slowly backing down the driveway.

While the red truck backed down the driveway, E.V. reported over the radio that the red truck was backing into the driveway of a residence and listed two potential street addresses. Devalkenaere made a request to dispatch regarding whether any information had come back on the license plate number he had reported but had not received an answer. As the red pickup began to move into the backyard of the residence, T.S. radioed to Devalkenaere that T.S. was at 39th and Indiana if Devalkenaere wanted to go to the residence with T.S. Devalkenaere responded that he needed to put on a police vest first.

After the red truck had moved into the backyard of the residence, T.S. radioed that he was at 41st and College. Devalkenaere radioed that he was nearby and would follow T.S. in. T.S. reported over the radio that he and Devalkenaere were in plainclothes, but were wearing vests. The red truck began backing under a carport, which was located in the backyard of the residence and was attached to the house.

T.S. arrived at the residence more than two minutes after the red truck arrived and while the truck was backing under the carport in the backyard. T.S. arrived prior to Devalkenaere. T.S. parked in the driveway of the residence. He drew his gun and exited his vehicle. A female, R.M., who lived with Victim at the residence, was standing on the porch in a pink robe. T.S. assumed the woman lived at the residence, but he did not seek any information from the woman. T.S. had already decided that he was going to enter the backyard of her property to conduct an investigation regardless of whether the woman

4

consented to it.  T.S. testified that he was there to investigate his suspicion that the driver of the red truck had committed a crime more serious than traffic violations.  T.S. admitted that he did not have probable cause that such a crime was committed, but wanted to investigate further based on the information A.H. put out over the radio.  T.S. walked to the back of the residence with his gun drawn.  T.S. stated that his objective in going into the backyard was to observe and learn.  T.S. wanted to speak with the driver of the red truck because it was possible that there was a victim of an unknown crime, a suspicion which T.S. was basing on A.H.'s report of a red truck chasing a Mustang.  After proceeding into the backyard along the south side of the house, T.S. walked across the yard toward where the red truck was slowly backing under the carport awning, which was connected to the garage and basement of the house.  T.S. followed the truck under the awning.

Devalkenaere arrived at the residence shortly after T.S., as T.S. was already walking toward the backyard.  Devalkenaere was there to conduct an investigation and to assist T.S. with the investigation that T.S. was performing.  He exited his vehicle and proceeded across the front lawn on the north side of the house toward the back, which he did as T.S. proceeded down the driveway on the south side of the house and into the backyard.  Devalkenaere saw the resident of the home standing on her front porch in a pink bathrobe.  Although the woman was simply standing on her front porch in a robe,

Devalkenaere pointed his gun at her and told her not to move.[3] Devalkenaere did not stop to talk to her as he proceeded to the back of the house, but asked the resident how many people were in the back of the house as he proceeded. Devalkenaere did not ask the resident for her permission to enter her private property because he was going into the backyard regardless of whether she consented.[4] Devalkenaere was there to help investigate a possible crime but he did not know what crime. Devalkenaere testified that he was aware that he was on private property with his gun drawn without a warrant and without probable cause that the driver of the red truck had committed a crime other than a traffic violation. A fence-like barricade blocked Devalkenaere from entering the backyard of the house. Devalkenaere kicked over this barricade and entered the backyard.

Nine seconds after T.S. approached the carport after having walked across the backyard, Devalkenaere fired four shots at Victim.[5] One shot hit Victim in the leg, and one shot hit Victim in the chest and was fatal. T.S. was underneath the carport and standing directly in front of the truck on the driver's side when Devalkenaere began

---

[3] Devalkenaere denied that this occurred. However, we view the evidence in the light most favorable to the verdict. R.M. testified that Devalkenaere pointed his gun at her.

[4] Devalkenaere testified that he was going into the backyard regardless of whether he had R.M.'s consent because T.S. was going to be in the backyard and T.S. would be anticipating that Devalkenaere would be in a position to assist with the investigation.

[5] The exhibit containing the helicopter surveillance footage shows that the helicopter camera zoomed out approximately two seconds before the gunshots and zoomed out further upon hearing the gunshots.

6

shooting.  T.S. testified that, in the nine seconds after he approached the vehicle, he had attempted to instruct Victim to put the truck in park, had tried to explain that the truck was not going to fit in the garage, and had attempted to inform Victim that the mirrors on the truck stuck out too far.  T.S. was unsure if Victim could hear him over the sound of the truck, and T.S. testified that T.S. was not shouting.  Regarding what happened at the time of the shooting, T.S. testified that he was instructing Victim to put the truck in park, when he heard Devalkenaere say "he's got a gun, he's got a gun" and then immediately begin firing at Victim.  T.S. gave a statement hours after the shooting, in which T.S. stated that, as he attempted to speak with the driver, he saw the driver's left hand on the steering wheel and the driver was looking at him.  T.S. could see Victim's left hand waving at T.S. in an open position when Devalkenaere said Victim had a gun (which Devalkenaere later testified was in Victim's left hand) and immediately began firing at Victim.  T.S. never saw Victim in possession of a gun and never saw Victim make a motion that he was reaching for a gun.  At no point did T.S. believe his life was threatened until he heard Devalkenaere begin firing his gun.  T.S. testified that he saw Victim's body tilt toward the passenger side of the truck after hearing the shots fired by Devalkenaere.

Devalkenaere testified that, prior to the shooting, he saw Victim lean to the passenger side of the truck and reach into his waistband and pull out a gun with his left hand.  Devalkenaere testified that he then saw Victim position the gun between his legs underneath the steering wheel.  Devalkenaere testified that he then saw Victim raise the

7

gun with his left hand around the left side of the steering wheel, at which point Devalkenaere fired four shots at Victim.[6]

Victim was right-handed.

After Devalkenaere shot Victim, the truck rolled backward down a decline from the carport area and into the open garage door, which was attached to and which opened up into the basement of the house. The officers radioed that shots had been fired and requested assistance. Numerous police cars arrived, and eventually a sweep of the garage occurred.

In the light most favorable to the verdict, Victim was not in possession of a gun at the time of the shooting. R.M. testified that, prior to Victim returning to the house, she saw a gun that belonged to Victim on the third-to-the-bottom step of the stairs in the basement/garage area, indicating that the gun was not in Victim's possession at the time of the shooting. The gun was later found on the ground near the driver's side door of the truck where the truck came to rest, which was a few feet from the basement stairs. Although T.S. testified that he saw Victim slump to the right/passenger side of the truck after the shots were fired, photos taken after the sweep showed Victim's body leaned

---

[6] Devalkenaere's testimony in this regard was contrary to the verdict. In viewing the evidence in the light most favorable to the verdict, we disregard evidence and inferences contrary to the verdict. *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015). Thus, although provided for context, this testimony is disregarded under our prescribed standard of review.

toward the driver's (left) side window, with his left arm dangling out of the window. Photos showed the gun on the ground nearby.[7]

Minutes after the shooting, Devalkenaere stated over the police radio: "When we arrived here the lady in pink was telling us that the Mustang had come over here prior with guns, and that's what led to the pursuit witnessed by [A.H.]" However, neither T.S., nor Devalkenaere received such information from the resident when they arrived, nor did they attempt to gather any such information from her when they arrived.[8]

The State charged Devalkenaere with involuntary manslaughter in the first degree for recklessly causing the death of Victim by shooting him. Devalkenaere was also charged with armed criminal action. Devalkenaere waived his right to a jury trial. A bench trial began on November 8, 2021. On November 11, 2021, the trial court judge visited and examined the scene of the shooting. Following the close of the evidence and closing arguments on November 12, 2021, the trial court took the matter under advisement.

---

[7] Less than four hours after the shooting on December 3, 2019, KCPD issued a media report indicating that a detective had shot a male subject inside the subject's vehicle. The report indicated that the deceased male's left arm and head were hanging out of the driver window of the vehicle and that a handgun was found in the vicinity of where the driver's left hand was hanging. Devalkenaere first gave an initial statement on December 5, 2019, two days after the incident.

[8] Devalkenaere agreed that he did not learn any such information prior to the shooting. He testified that he overheard such information after the shooting and put it out over the radio. Therefore, Devalkenaere's broadcasted statement shortly after the incident, which suggested he had information prior to his entry onto Victim's private property (with gun drawn) was false to the extent it suggested he had such information prior to (and justifying) his entry onto Victim's private property.

On November 19, 2021, the trial court entered its verdict, which found Devalkenaere guilty of the lesser included offense of involuntary manslaughter in the second degree and guilty of armed criminal action. The trial court also made an oral announcement of the verdict on that day which included legal conclusions and findings on some of the factual issues presented. In the trial court's oral announcement, the trial court stated that there were numerous significant and troubling issues of fact which had been presented in the case, and that the case involved issues of law for the trial court's determination including issues of law relating to the Fourth Amendment of the United States Constitution. The trial court found that there was a lack of any real dispute that Devalkenaere and T.S. had no probable cause to believe that Victim had committed a crime; that Devalkenaere and T.S. had no arrest warrant for Victim; that they were not at the location of the shooting to arrest Victim; that they did not have probable cause to obtain an arrest warrant for Victim; that they had no search warrant for the residence or the red truck or probable cause to obtain one; that they did not have consent to be on the property of the residence; that they were not engaged in a pursuit of Victim, fresh, hot, or otherwise; and that no exigent circumstances justified the presence of T.S. and Devalkenaere on the private property of the residence. The trial court concluded that the backyard of the residence, and particularly the carport, driveway, and garage areas were areas included within the curtilage of the residence, and that Victim had a reasonable expectation of privacy in those areas such that they could not be deemed places that were open to the public. The trial court determined that T.S. and Devalkenaere were not

10

lawfully present in the backyard/carport area. The trial court found that T.S. and Devalkenaere were initial aggressors in the encounter with Victim and that they had a duty to retreat prior to using force. The trial court found that Devalkenaere was not acting in lawful self-defense when he shot and killed Victim; that Devalkenaere was not acting in lawful defense of T.S. when he shot and killed Victim; and that, because Devalkenaere and T.S. were not effecting an arrest, Devalkenaere did not lawfully utilize deadly force as a law enforcement officer under applicable Missouri use of force laws. The trial court found that Devalkenaere acted with criminal negligence in causing Victim's death.

On March 4, 2022, the trial court held a sentencing hearing after which Devalkenaere was sentenced to a term of three years on the conviction for involuntary manslaughter in the second degree and a term of six years on the conviction for armed criminal action, with the sentences to run concurrently.

Devalkenaere now appeals to this court.

**Analysis**

Devalkenaere was convicted of involuntary manslaughter in the second degree and armed criminal action. The trial court also found that Devalkenaere was not acting in lawful self-defense when he shot and killed Victim, that Devalkenaere was not acting in lawful defense of T.S., and that Devalkenaere was not lawfully utilizing deadly force as a law enforcement officer under applicable Missouri laws.

11

"A person commits the offense of involuntary manslaughter in the second degree if he or she acts with criminal negligence to cause the death of any person." § 565.027.1.[9] Thus, in order to convict Devalkenaere of involuntary manslaughter in the second degree, the prosecution was required to establish that Devalkenaere caused Victim's death, and that Devalkenaere acted with criminal negligence in doing so. A person acts with criminal negligence "when he or she fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.5.

Additionally, Devalkenaere injected the issue of whether the shooting was justified in defense of a third person (of fellow officer T.S.) under section 563.031. Generally, section 563.031 contains provisions regarding when a person may use force in self-defense or in defense of others. The defendant has the burden of injecting the issue of justification under section 563.031. *See* § 563.031.5. Once the defendant has properly injected the issue of justification, the state has the burden of proving the absence of such justification beyond a reasonable doubt. *See* § 556.061(3). In other words, once the defendant properly injects the issue, such that it can be submitted to the trier of fact, the prosecution has the burden of persuading the trier of fact of the absence of justification beyond a reasonable doubt. *See* § 556.061(3)(b) ("If the issue is submitted to the trier of

_____

[9] Unless otherwise indicated, statutory references are to RSMo 2016, as updated through the 2018 cumulative supplement.

12

fact any reasonable doubt on the issue requires a finding for the defendant on that issue");

*see also State v. Clark*, 486 S.W.3d 479, 490 (Mo. App. W.D. 2016) (once defendant injects issue of self-defense, burden shifts to state to prove absence of self-defense beyond reasonable doubt). The trial court found that Devalkenaere was not justified in shooting and killing Victim.

Devalkenaere raises eight points on appeal, five of which challenge the sufficiency of the evidence (points 2, 4, 5, 6, and 7), two of which appear to present legal challenges (points 1 and 3), and one point challenging his armed criminal action conviction on the ground that his involuntary manslaughter conviction must be reversed (point 8). For ease of analysis we address these points out of order. We first address Devalkenaere's points five and two, which challenge the sufficiency of the evidence in support of the elements that constitute involuntary manslaughter in the second degree. We then address Devalkenaere's fourth, sixth, and seventh points together, which challenge the evidence regarding the trial court's finding that the shooting was not justified under section 563.031. We then address Devalkenaere's first point, which appears to present a legal challenge to the trial court's conclusion that Devalkenaere unlawfully entered Victim's curtilage. We then address Devalkenaere's third point which presents a jumbled argument that appears to be a legal challenge to the trial court's finding that the shooting was not justified. We conclude by addressing Devalkenaere's eighth point, which challenges his armed criminal action conviction on the basis that his armed criminal

13

action conviction cannot stand unless his involuntary manslaughter conviction is affirmed.

Before addressing the points raised on appeal, we first address the standard of review in this case as well as arguments raised in this appeal regarding what that standard of review entails.

## Standard of Review

Article I, section 22(a) of the Missouri Constitution provides "that in every criminal case any defendant may, with the assent of the court, waive a jury trial and submit the trial of such case to the court, whose finding shall have the force and effect of a verdict of a jury." *See also* Rule 27.01(b). In reviewing the sufficiency of the evidence in a court-tried criminal case, an appellate court applies the same standard used in a jury-tried case. *State v. Niederstadt*, 66 S.W.3d 12, 13 (Mo. banc 2002). "[T]he appellate court's role is limited to a determination of whether the State presented sufficient evidence from which a trier of fact could have reasonably found the defendant guilty." *State v. Twitty*, 506 S.W.3d 345, 346 (Mo. banc 2017) (quoting *State v. Vandevere*, 175 S.W.3d 107, 108 (Mo. banc 2005)). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Liberty*, 370 S.W.3d 537, 543-44 (Mo. banc 2012) (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)). "[T]his Court does not weigh the evidence but,

rather, accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidence and inferences." *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015) (quotations, brackets, and citation omitted); *see also State v. Willis*, 654 S.W.2d 78, 79 (Mo. banc 1983) ("We, of course, take the evidence in the manner most favorable to the judgment and, where there are no specific findings, assume that the trial judge made such findings, when supported by evidence, as are consistent with the result he reached.").

Devalkenaere argues that the evidence must be considered in the light most favorable to him. This argument appears to be based on a statement that the trial court made at sentencing when addressing a mitigating factor. At sentencing, the trial court stated:

> The circumstances of the events as described during the trial, however, also provide the Court with the mitigating factor. I found as I considered the evidence of the case that the defendant Eric Devalkenaere testified credibly at trial. He was rushing to provide cover for [T.S.] who had rushed into the backyard with his weapon drawn prompting the defendant to do the same from the other side of the house. Although not in the Court's view, again rightly or wrongly, beginning his obligation to act with reasonable care as the Court found he has failed to do, his natural reaction to protect his partner is a factor for me to also consider.

This statement was made by the trial court in assessing punishment rather than in adjudicating guilt. This statement was made more than three months after the verdict had been announced and entered. Devalkenaere's guilt had already been adjudicated by that time such that the trial court's statement did not affect the verdict. *See State v. Clark*, 486 S.W.3d 479, 492 n.10 (Mo. App. W.D. 2016) (oral statements made by trial court at

15

sentencing in bench trial are not relevant to verdict where statements are made after trial court has fully adjudicated guilt); *see generally* § 557.036 (guilt stage and punishment stages of trial are separate). Devalkenaere cites to no legal authority whereby a trier of fact in a bench trial may amend a verdict after it has been entered. The Missouri Constitution requires that a verdict in a bench trial "shall have the force and effect of a verdict of a jury." Mo. Const. art. I, § 22(a). Additionally, there is no indication that the trial court was attempting to amend its verdict, but instead was assessing factors related to sentencing.

Further, at least with respect to Devalkenaere's sufficiency of the evidence challenges, it is no accident that courts regularly speak in terms of what "any" rational trier of fact "could have" or "might have" found when assessing a sufficiency of the evidence challenge. Sufficiency of the evidence challenges in Missouri have long echoed "the due process standard announced by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979)." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998) (quoting *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993)). *Jackson v. Virginia* made clear that, in a sufficiency of the evidence challenge, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Sufficiency of the evidence challenges are regularly discussed in terms of whether the prosecution made a submissible case, because "[s]ufficiency review essentially addresses whether the government's case was

16

so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (internal quotations omitted). In other words, "[a]ll that a defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all." *Id.* at 244.

Although *Musacchio* was a federal jury-tried case, the Missouri Supreme Court has long held that the standard for a sufficiency of the evidence challenge is the same in a court-tried criminal case as it is in a jury-tried case, which is consistent with the Missouri Constitution. *See Niederstadt*, 66 S.W.3d at 13; Mo. Const. art. I, § 22(a) (in court-tried cases, the court's "finding shall have the force and effect of a verdict of a jury"). And, the Missouri Supreme Court has twice cited *Musacchio* with approval when delineating the standard for sufficiency of the evidence challenges in Missouri. *See State v. Clark*, 490 S.W.3d 704, 707 (Mo. banc 2016); *see also State v. Zetina-Torres*, 482 S.W.3d 801, 809 (Mo. banc 2016). Because the question in a sufficiency challenge is whether the evidence was sufficient to reach the trier of fact at all, what a particular trier of fact found is not the focus of a sufficiency of the evidence challenge, and is not necessarily indicative of what another trier of fact could have found based on the evidence. *See Zetina-Torres*, 482 S.W.3d at 809 (quoting *Musacchio*, 577 U.S. at 243). Instead, such a challenge asks what *any* reasonable trier of fact *could have* found based on the evidence. *Id.* In other words, if the evidence is sufficient for the case to be submitted to the trier of

17

fact (because a trier of fact could reasonably find guilt), a sufficiency of the evidence challenge will invariably fail.[10]

Moreover, Devalkenaere's argument that we must review the verdict in the light most favorable to him completely disregards the context of the statement made at sentencing. Even if we were to consider the trial court's oral statements at sentencing as affecting the verdict (which we do not), the statement on which Devalkenaere relies does not indicate that the trial court believed all of Devalkenaere's testimony at trial, as he argues. The trial court's statement at sentencing was made with regard to a mitigating factor and must be read in context. The specific mitigating factor that the court found was that, even though Devalkenaere acted with criminal negligence in rushing into the backyard, he did so out of genuine concern for T.S., who had already unreasonably rushed into the backyard. The trial court's comment regarding credibility must be read in context. The trial court's comment was made in the context of assessing mitigating and aggravating factors, and the comment related to Devalkenaere's state of mind in entering the backyard.

We reject Devalkenaere's arguments that we review the evidence in the light most favorable to him, as his arguments are contrary to our prescribed standard of review.

---

[10] This is not to suggest that what a particular fact-finder found in adjudicating guilt could not be relevant to a legal challenge separate and distinct from a sufficiency of the evidence challenge; however, a sufficiency of the evidence challenge is a distinct legal challenge that asks whether a defendant is entitled to acquittal as a matter of law because the evidence was so lacking that the case never should have been submitted to the trier of fact at all. *See Musacchio*, 577 U.S. at 244.

**Point Five**

In his fifth point, Devalkenaere argues that there was insufficient evidence to prove the indispensable element that Devalkenaere's negligence caused Victim's death. Devalkenaere's fifth point on appeal is comprised of two paragraphs of arguments, which fail to crystallize precisely what Devalkenaere is arguing. However, Devalkenaere's point relied on indicates that it is a sufficiency of the evidence challenge to an indispensable element, which we understand to be the element of causation. Accordingly, we address whether there was sufficient evidence that Devalkenaere caused Victim's death. We note that Devalkenaere fails to view the evidence in the light most favorable to the verdict rendering his arguments analytically useless. Additionally, despite being such a short argument section, Devalkenaere fails to support factual assertions in his argument section with specific page references to the record on appeal in violation of Rule 84.04(e). In any case, we address the issue on the merits.

Devalkenaere was charged with causing Victim's death by shooting Victim. The evidence at trial was that Devalkenaere shot Victim twice, and that the gunshot wounds were the cause of Victim's death. The evidence was sufficient for a reasonable trier of fact to find that Devalkenaere caused Victim's death.

Point five is denied.

**Point Two**

In his second point on appeal, Devalkenaere argues that the trial court erred in convicting him of involuntary manslaughter in the second degree because there was

19

insufficient evidence to establish that Devalkenaere acted with criminal negligence. More specifically, Devalkenaere argues that there was no evidence that he grossly deviated from any established standard of care.

Aside from the fact that Devalkenaere's behavior that day was in conflict with his training and many KCPD policies,[11] and aside from the fact that Devalkenaere's entry into the curtilage of the Victim's residence was not lawful (as discussed in our analysis of point one below), Devalkenaere's second point fails to address the evidence that he knowingly shot and killed Victim. There was evidence (including Devalkenaere's own testimony) that Devalkenaere intended to fire his gun and that he intended to strike Victim at center mass, such as would be sufficient to support a finding that Devalkenaere knowingly caused Victim's death by shooting him. Section 562.021.4 provides, in pertinent part: "If the definition of an offense prescribes criminal negligence as the culpable mental state, it is also established if a person acts purposely or knowingly or

---

[11] Devalkenaere had been trained that the Fourth Amendment prohibits unreasonable searches and seizures in the home of a person and in the curtilage of the home. He had been trained that curtilage examples included "[a]ll outbuildings used in connection with the residence, such as garages, carport connected to house, sheds or barns connected with or in close vicinity of the residence. Clearly the arm's length around the house." Devalkenaere had been trained that if something was in the curtilage of a residence, it should be pictured as being inside the house. KCPD policies instructed Devalkenaere that an arrest can be made without a warrant in a private place where a person expects privacy only if there is probable cause and consent to enter; probable cause and exigent circumstances; or probable cause and officers had begun to physically effect an arrest in a public place, which the suspect attempts to defeat by escaping to a private place. The policies listed examples of exigent circumstances as: (1) a reasonable belief that unless the officer enters, there is an immediate threat of injury or death; (2) fresh pursuit of a fleeing suspect that the officer has probable cause to arrest for a serious felony freshly committed; (3) probable cause to believe that critical evidence will be destroyed unless an arrest is made immediately.

recklessly. . . ." Accordingly, there was sufficient evidence that Devalkenaere acted negligently in causing Victim's death by shooting Victim.

Point Two is denied.

**Points Four, Six, Seven**

In his fourth, sixth, and seventh points, Devalkenaere contends that there was insufficient evidence for the trial court to have found that his actions were not justified in defense of another under section 563.031. In his fourth point, Devalkenaere contends that the evidence was insufficient for the trial court to find that he was an initial aggressor. In his sixth point, Devalkenaere makes the conclusory assertion that there was insufficient evidence that his shooting of Victim was not justified. In his seventh point, Devalkenaere argues that there was insufficient evidence to support a finding that his belief that he needed to shoot Victim was unreasonable.

The use of physical force in self-defense or in defense of others is justified in certain circumstances delineated in section 563.031. Generally, a person is authorized to "use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person . . . ." § 563.031.1. However, section 563.031.1 provides that there are certain circumstances under which a person is not entitled to rely on the general authorization of self-defense or defense of others. One such circumstance exists when the person claiming justification was the initial aggressor in the encounter that led to the

21

use of force. § 563.031.1(1). If the person claiming justification is found to be the initial aggressor, then such person is only justified in using such force if:

(a) He or she has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened use of unlawful force; or

(b) He or she is a law enforcement officer and as such is an aggressor pursuant to section 563.046; or

(c) the aggressor is justified under some other provision of [Chapter 563] or other provision of law[.]

§ 563.031.1(1). Additionally, a person using force in defense of a third person is not justified in using such force under the general provisions of section 563.031.1 if: "Under the circumstances as the actor reasonably believes them to be, the person whom he or she seeks to protect would not be justified in using such protective force[.]" § 563.031.1(2).[12]

In addition to these general requirements regarding the use of force in defense under section 563.031, there are further limitations on the use of deadly force in defense of self or others. § 563.031.2. Section 563.031.2 provides:

A person shall not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:

(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony;

---

[12] Additionally, a person is not justified in using force under section 563.031.1 if the person claiming justification "was attempting to commit, committing, or escaping after the commission of a forcible felony." § 563.031.1(3).

(2) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter a dwelling, residence, or vehicle lawfully occupied by such person; or

(3) Such force is used against a person who unlawfully enters, remains after unlawfully entering, or attempts to unlawfully enter private property that is owned or leased by an individual, or is occupied by an individual who has been given specific authority by the property owner to occupy the property, claiming a justification of using protective force under this section.

Deadly force is "physical force which the actor uses with the purpose of causing or which he or she knows to create a substantial risk of causing death or serious physical injury[.]" § 563.011(2).

The trial court found that T.S. and Devalkenaere were initial aggressors who were not entitled to use force in their encounter with Victim without first retreating. The trial court found that Devalkenaere did not act in lawful self-defense or in lawful defense of T.S. when Devalkenaere shot and killed Victim. The trial court also found Devalkenaere was not entitled to use force as a law enforcement officer under Missouri use of force laws applicable to such officers (*i.e.*, section 563.046) because it was conceded that neither T.S. nor Devalkenaere were effecting an arrest of Victim.

"A person is entitled to acquittal as a matter of law on the basis of self-defense only if there is undisputed and uncontradicted evidence clearly establishing self-defense." *State v. Williams*, 608 S.W.3d 205, 209 (Mo. App. W.D. 2020) (internal quotations and citation omitted). "Where there is conflicting evidence or when different inferences can reasonably be drawn from the evidence, whether the defendant acted in defense of

23

another is a question for the trier of fact." *Id.* (internal quotations, brackets, and citation omitted).

Devalkenaere argues in his seventh point that there was insufficient evidence to establish that Devalkenaere did not reasonably believe that his use of force was necessary to defend against what he reasonably believed was the use or imminent use of unlawful force.

As an initial matter, Devalkenaere argues that this was an indispensable element of his conviction. This assertion is incorrect. Although it is indispensable that the trier of fact find beyond a reasonable doubt that a defendant's properly injected defense of justification fails, a defense of justification may fail for more than one alternative reason. For example, (and as pertinent to this case), force used by a defendant claiming that his use of force was justified in defense of others may fail (1) because the trier of fact determines the defendant was the initial aggressor (without being subject to an exception under section 563.031.1(1)), *or* (2) because the trier of fact determines that the defendant did not reasonably believe such force was necessary to defend another from what he or she reasonably believed to be the use or imminent use of unlawful force by another person, *or* (3) because the trier of fact determines the defendant did not reasonably believe the use of deadly force was necessary to defend another against death, serious physical injury or a forcible felony, *or* (4) because the trier of fact determines that the defendant did not reasonably believe that there were circumstances under which the person whom the defendant sought to protect would be justified in using the force used

24

by the defendant. *See* § 563.031.1-2. If the trier of fact finds that the defense of justification fails for any of these reasons, then it is not necessary for the trier of fact to address whether the other circumstances required for the conduct to be justified were present. In other words, when there are multiple circumstances that must all be present for the use of force to be justified, then the finding by the trier of fact that any one of them are absent dispenses with the necessity that the trier of fact address the others. As a corollary, to establish that there was insufficient evidence for a trier of fact to find that the defense of justification failed, so as to be entitled to acquittal, a defendant must establish that there was insufficient evidence for a trier of fact to find the absence of any of the necessary circumstances that were in issue. This is true even if the trier of fact made no specific findings on that element. *See Willis*, 654 S.W.2d at 79 ("We, of course, take the evidence in the manner most favorable to the judgment and, where there are no specific findings, assume that the trial judge made such findings, when supported by evidence, as are consistent with the result he reached.").

Thus, a defendant cannot establish that he or she is entitled to an acquittal by showing that there was insufficient evidence to support a finding of the absence of *only one* of the necessary circumstances; instead, the defendant must show that there was insufficient evidence to support a finding of the absence of *each* of the necessary circumstances. Accordingly, Devalkenaere's assertion that a single element of a multi-element defense of justification is an indispensable element is incorrect. *See State v. Sinks*, 652 S.W.3d 322, 339 (Mo. App. E.D. 2022) (even if defendant is not the initial

25

aggressor, claim of justifiable self-defense fails when the record contains sufficient evidence from which the trier of fact reasonably could find that defendant lacked a reasonable belief that he or she needed to use deadly force to protect against an imminent use of unlawful force by the victim).

The trial court found against Devalkenaere on his defense of justification under section 563.031. There was conflicting evidence as to whether Devalkenaere reasonably believed that his use of deadly force was necessary to protect T.S. from serious physical injury. There was conflicting evidence as to whether Devalkenaere reasonably believed his use of force was necessary to defend against what he reasonably believed was the use or imminent use of unlawful force by Victim. Accordingly, these factual questions were in issue at trial. The trial court's oral findings accompanying the verdict indicate that the trial court found that Devalkenaere was not entitled to use force in defense of T.S. because T.S. and Devalkenaere were initial aggressors and had a duty to retreat. The trial court went on to find Devalkenaere was not acting in lawful defense of T.S. when he shot and killed Victim. The trial court's oral announcement did not make specific factual findings regarding the other elements of Devalkenaere's justification defense that were in issue; thus, such issues are considered as having been found in accordance with the verdict. When addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Thus, we consider whether the trial court

26

could have found beyond a reasonable doubt that Devalkenaere did not reasonably believe that his use of deadly force was necessary to protect T.S. from death or serious physical injury and whether the trial court could have found that Devalkenaere did not reasonably believe Victim was using or would imminently use unlawful force so as to give rise to a reasonable belief that his own use of force was necessary to protect T.S.

Devalkenaere does not in any point on appeal challenge whether there was insufficient evidence for the trier of fact to find beyond a reasonable doubt that he did not reasonably believe that deadly force was necessary to protect T.S. against death or serious physical injury. This failure to address his use of deadly force is fatal to his claim that his shooting of Victim was justified in defense of T.S.

In any case, the evidence was sufficient for a reasonable trier of fact to reject Devalkenaere's defense of justification, as there was sufficient evidence for a reasonable trier of fact to find that Devalkenaere shot Victim at a time when he did not reasonably believe that his use of deadly force was necessary to protect T.S. against death or serious physical injury or that Devalkenaere did not reasonably believe Victim was using or would imminently use unlawful force. Even though Devalkenaere's arguments fail to present the evidence in the light most favorable to the verdict and are therefore analytically useless and insufficient to establish error, and even though Devalkenaere does not properly address the sufficiency of the evidence on the deadly force requirement, we address this point on the merits.

27

As there was conflicting evidence, and as different inferences could be drawn from the evidence, whether Devalkenaere was justified in acting in defense of another was a question of fact. *See Williams*, 608 S.W.3d at 209. In the light most favorable to the verdict, there was evidence from which a reasonable trier of fact could determine that Devalkenaere shot Victim at a time when Victim was unarmed and not threatening force. There was evidence indicating that Victim's left hand was waving at T.S. with an open palm when Devalkenaere said Victim had a gun and immediately began shooting. Devalkenaere testified that he saw Victim pull a gun from his waistband with his left hand and point it at T.S. when Devalkenaere began shooting. However, this evidence is contrary to the verdict and is disregarded. But, if Devalkenaere did not see a gun in Victim's left hand at the time of the shooting because Victim's left hand was waving at T.S. with an open palm – a finding supported by evidence – then a reasonable trier of fact could clearly conclude that Devalkenaere did not reasonably believe that Victim was threatening force such as would have caused death or serious physical injury so as to give rise to a reasonable belief that his use of deadly force was necessary.

Further, there was also evidence from Victim's co-resident, R.M., that Victim had left the gun that belonged to him (and which was later found near where Victim's truck came to rest in his garage) on the stairs in his basement, such that the gun would have been on the stairs in the basement (which was close in proximity to where the gun was eventually found) rather than in his possession when the shooting occurred. Keeping in mind that "this Court does not weigh the evidence but, rather, accepts as true all evidence

28

tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidence and inferences[,]" *Claycomb*, 470 S.W.3d at 362, a rational trier of fact could conclude that Victim was unarmed at the time of the shooting, that Victim did not engage in the behavior of pointing a gun at T.S., and that Devalkenaere did not reasonably believe Victim was threatening deadly force at the time of the shooting.

Point seven is denied.

In his fourth point on appeal, Devalkenaere argues that there was insufficient evidence that he was an initial aggressor because trespass is not an attack or a threat to attack. The arguments following this point fail to view the evidence in the light most favorable to the verdict making these arguments analytically useless. Further, as is frequently the case throughout his briefing, Devalkenaere fails to provide page references to factual assertions in his argument in violation of Rule 84.04(e). Further, Devalkenaere completely neglects to address the entirety of the evidence supporting a finding that T.S. and Devalkenaere were initial aggressors beyond their unlawful entry into the backyard/carport area of Victim's residence. They were two uninvited men, in the backyard of a stranger, and were approaching with guns in their hands. Devalkenaere kicked over a barricade in entering Victim's backyard. As discussed above, there was further evidence from which the trier of fact could find that Victim never threatened force at any time during the encounter. When there is contradictory evidence regarding who was an initial aggressor in an encounter, the issue is a question of fact for the trier of fact to decide. *State v. Barriere*, 556 S.W.3d 128, 134 (Mo. App. W.D. 2018). The evidence

was sufficient for a rational trier of fact to find that Devalkenaere was the initial aggressor in the encounter.

Point four is denied.

In his sixth point on appeal, Devalkenaere argues that there was insufficient evidence of an indispensable element for his involuntary manslaughter conviction because the State failed to prove that his shooting of Victim was unjustified. This point indicates that Devalkenaere is arguing that the State failed to prove an element of a defense but fails to indicate what element was lacking. Instead, Devalkenaere's arguments on this point (which are comprised of two confusing paragraphs that amount to less than one page of his brief) simply argue that the State failed to prove that the shooting was not justified without providing sufficient support as to why. These conclusory assertions fail to establish error.

Point six is denied.

**Point One**

In his first point on appeal, Devalkenaere argues:

The Circuit Court erred in convicting Appellant of involuntary manslaughter because Appellant was authorized by the Fourth Amendment, Section 544.216 and Section 563.046 to enter the decedent's curtilage, in that Appellant and his fellow officer had probable cause to stop this motorist, and in December, 2019, Supreme Court precedent did not prohibit their entry upon the curtilage of a suspect's property to do so.

30

Devalkenaere's first point relied on is quite vague and does not provide this court with any explanation of why, in the context of the case, this point would constitute reversible error. Rule 84.04(d) provides:

> (1) Where the appellate court reviews the decision of a trial court, each point shall:
> (A) Identify the trial court ruling or action that the appellant challenges;
> (B) State concisely the legal reasons for the appellant's claim of reversible error; and
> (C) Explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

Devalkenaere's first point appears to try to raise a challenge to a legal conclusion of the trial court but fails to identify a specific legal conclusion, instead arguing his conviction was in error. Devalkenaere's point also fails to explain why, in the context of the case, his legal reasons support a claim of reversible error. The point appears to assert that he was authorized to enter Victim's curtilage by sections 563.046 and section 544.216, as well as the Fourth Amendment of the Constitution of the United States. However, the argument section following the point does not include any discussion of section 563.046. Section 544.216 is simply cited, once, for the proposition that an officer may generally arrest a person when the officer has probable cause to believe that the person has violated an ordinance or law of the state. Of course, that statute is largely irrelevant if no arrest is attempted to be made, as was found by the trial court.[13] Further, Devalkenaere seems to

---

[13] In this matter, there was no testimony at trial that either T.S. or Devalkenaere were entering Victim's property to make an arrest, as both officers testified they were going into the backyard to conduct an investigation.

31

make arguments that an officer may do on private property whatever the officer may do on public property. In this matter, there is little dispute that Victim could have been subject to a traffic stop for committing traffic violations had such a stop been initiated in a public place, but that did not occur in this case. However, there are clearly limits in the law regarding when an officer may invade the sanctity of the home. *See Payton v. New York*, 445 U.S. 573, 576 (1980) ("[T]he reasons for upholding warrantless arrests in a public place do not apply to warrantless invasions of the privacy of the home."). For example, if an arrest is made in a place where the officer is not lawfully present, the arrest is illegal, such that probable cause alone is insufficient to justify the arrest. *See State v. Hunt*, 451 S.W.3d 251, 262 (Mo. banc 2014) ("The lawfulness of the arrest was dependent on the lawfulness of the forced entry into the residence because if Deputy Hunt unlawfully entered, his very presence in the residence was illegal and so was the arrest.").

Devalkenaere then argues that the Fourth Amendment authorized the arrest. The Fourth Amendment, however, protects individuals from unreasonable searches and seizures. It does not authorize police conduct. Moreover, Devalkenaere's argument following his first point fails to make a legitimate attempt to set forth the law regarding when an officer may enter a place in which an individual has a constitutionally protected privacy interest. Devalkenaere's point on appeal, thus, fails to provide any analysis that would support a claim of reversible error. It also fails to directly point to any particular legal conclusion of the trial court he is challenging. The trial court's determination that

T.S. and Devalkenaere made an unlawful entry into Victim's private curtilage was based on numerous legal and factual conclusions, and Devalkenaere makes no attempt to specify which of those he takes issue with in his point relied on. "Rule 84.04(d) prohibits a point relied on that groups together multiple contentions not related to a single issue and such a point is subject to dismissal." *State v. S.F.*, 483 S.W.3d 385, 389 n.5 (Mo. banc 2016). The arguments that follow Devalkenaere's point relied on include numerous unrelated theories that could not be predicted from the point relied on. "Errors raised in the argument portion of a brief but not raised in the points relied on need not be considered by this Court." *State v. Lammers*, 479 S.W.3d 624, 636 n.13 (Mo. banc 2016).

We have discretion to excuse technical violations in a brief and review points on the merits, which is our preference. Devalkenaere's arguments are nevertheless insufficient to establish trial court error.

The Fourth Amendment provides, in relevant part: "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1982) (internal quotations omitted). "The protections of the Fourth Amendment extend beyond a house itself, to the curtilage of a house." *State v. Bates*, 344 S.W.3d 783, 787 (Mo. App. S.D. 2011) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home

33

and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes." *Oliver*, 466 U.S. at 180 (internal quotations and citation omitted). "[T]he key issue in determining the legitimacy of police entry into a particular area is whether the occupant of the premises has somehow exhibited a reasonable expectation of privacy in that area." *State v. Edwards*, 36 S.W.3d 22, 27 (Mo. App. W.D. 2000).

In this appeal, it is undisputed that T.S. and Devalkenaere entered the curtilage of Victim's residence, that the shooting occurred on the curtilage, and that Victim was underneath the carport in his backyard and backing into the open garage door attached to his residence at the time of the shooting. The trial court found that Victim had a reasonable expectation of privacy in the area that the officers entered and that the area was not open to the public.

Although the curtilage is entitled to constitutional protection under the Fourth Amendment where the resident has a reasonable expectation of privacy, courts have recognized an exception to the warrant requirement where law enforcement officers can show both probable cause and exigent circumstances. *See Payton*, 445 U.S. at 590; *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("Police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.").

As best as we can discern, the only real argument Devalkenaere makes regarding exigent circumstances is that he was in hot or fresh pursuit of Victim. The rationale of the hot pursuit doctrine as an exigent circumstance exception that may allow warrantless

entries into private places in which an individual has constitutional protection is that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." *United States v. Santana*, 427 U.S. 38, 43 (1976). The trial court found that Devalkenaere was not in pursuit of Victim, hot, fresh, or otherwise. There was no evidence whatsoever that an arrest of Victim was set in motion in a public place or that Victim fled from an attempt to stop or arrest him. None of the officers at trial testified that they had attempted to stop or arrest Victim in a public place or indicated that they were engaging in a hot pursuit of Victim, as both T.S. and Devalkenaere testified that their purpose in entering the backyard of Victim's property was to conduct an investigation.

Devalkenaere also cites to section 544.157 as authorizing him to engage in "fresh pursuit." However, beyond arguing that the statute authorizes fresh pursuit, and making the conclusory assertion that he was doing so, Devalkenaere makes no legitimate attempt to set forth the law of what constitutes fresh pursuit. Although Devalkenaere cites to section 544.157.3 regarding the meaning of fresh pursuit, he omits and fails to address critical language of the statute, such as the language of the provision that states that "fresh pursuit" "shall imply instant pursuit." § 544.157.3. In any event, Missouri case law clearly indicates that what occurred on December 3, 2019 would not qualify as fresh pursuit under section 544.157. *See City of Ash Grove v. Christian*, 949 S.W.2d 259, 264 (Mo. App. S.D. 1997) ("[T]o show 'fresh pursuit' in accordance with the statutory mandate of section 544.157, police pursuit must be initiated within the peace officers'

35

jurisdiction, must be immediate and without delay, consistent with reasonable police safety practices, and should be accompanied with a purpose to stop the vehicle.").[14]  The trial court did not err in determining that Devalkenaere was not engaging in hot or fresh pursuit of Victim so as to be entitled to enter property in which Victim had constitutional protection.

Although it is not clear that it is encompassed in his vague and general point on appeal, Devalkenaere further argues that officers may enter the curtilage of a resident's house when that area is open to the public.  Even if we broadly construe his point to include this claim, his argument nevertheless fails.  Courts have determined that "there is no reasonable expectation of privacy subject to Fourth Amendment protection where the public at large is welcome." *Edwards*, 36 S.W.3d at 27 (quoting *State v. Kriley*, 976 S.W.2d 16, 22 (Mo. App. W.D. 1998)).  In this matter, the trial court found that Victim had a reasonable expectation of privacy in his backyard/carport area, and that the area was not open to the general public.  The trial court's conclusion is not erroneous. Devalkenaere has presented this court with no arguments indicating that the trial court's conclusion is in error.  The trial judge visited the residence and saw first hand whether the location would be considered open to the public.  We have also viewed the photograph exhibits and footage of the location and find that the location on which Devalkenaere

---

[14] Although *Christian* interpreted the version of section 544.157 that was in effect in 1995, the legislature has not changed the definition of "fresh pursuit" that is currently contained in section 544.157.3 since the time that the *Christian* court interpreted it.  *Compare* § 544.157.3 RSMo. 1994 Cum. Supp. *with* § 544.157.3 RSMo. 2016.

intruded would not be considered open to the public.  Devalkenaere makes no arguments as to how he simply made an entrance into the backyard in a manner that was open to the public when his entry into the backyard was blocked by a fence-like barricade that he had to kick over to enter the backyard.

The trial court did not err in determining that T.S. and Devalkenaere were not lawfully present in Victim's backyard/carport area.

Point one is denied.

## Point Three

In his third point on appeal, Devalkenaere argues that the trial court erred because trespassing[15] is irrelevant as to whether a shooting is justified under section 563.046 (and MAI Cr.4th 406.08) because trespassing does not summarily render an officer an "initial aggressor."  Devalkenaere's arguments in his third point misrepresent the trial court's determination as to why section 563.046 was inapplicable.  The trial court found that Devalkenaere "did not lawfully utilize deadly force as a law enforcement officer under Missouri use of force laws applicable to such officers."  The reason the trial court gave for rejecting this defense of justification was that it was "conceded that [Devalkenaere] and [T.S.] were not effecting an arrest of [Victim] or preventing [Victim's] escape after an arrest."  Devalkenaere does not argue in his third point that these findings were incorrect.

---

[15] The trial court's oral findings made at the announcement of the verdict do not actually use the term "trespassing."  The trial court did, however, find that T.S. and Devalkenaere unlawfully entered Victim's property.

He neglects the actual reason why the trial court found that he was not entitled to the initial aggressor exception referenced in section 563.031.1(1)(b), and instead suggests, contrary to the trial court's findings, that the trial court determined that trespassing summarily rendered an officer an initial aggressor such that the trial court failed to consider section 563.046.

Further, Devalkenaere does not provide briefing adequate to establish error on his third point. Devalkenaere's arguments following this point are quite confusing, as he never makes clear whether he is arguing that the trial court erred in rejecting his defense of justification under section 563.031 (defense of third persons) or under section 563.046 (force used by law enforcement officers in making an arrest). These are separate defenses of justification that contain separate factual issues. By failing to make clear which of the two separate defenses of justification provided the grounds for his asserted error, but instead seemingly arguing both, Devalkenaere's arguments render his point multifarious, preserving nothing for appeal. *See S.F.*, 483 S.W.3d at 389 n.5 ("Rule 84.04(d) prohibits a point relied on that groups together multiple contentions not related to a single issue and such a point is subject to dismissal."). As with most of his briefing, Devalkenaere fails to support his factual assertions with citations to the record in violation of Rule 84.04(e). Further, Devalkenaere makes factual arguments without viewing the evidence in the light most favorable to the verdict. Devalkenaere's arguments stray radically from what is presented in his point relied on. "Errors raised in the argument portion of a brief but not raised in the points relied on need not be

considered by this Court." *Lammers*, 479 S.W.3d at 636 n.13. As Devalkenaere fails to preserve his arguments with proper briefing, his point on appeal is subject to dismissal. *See* Rule 30.20.

Our best efforts at understanding his arguments would indicate that he is making a legal challenge, arguing that the trial court found that he and T.S. had unlawfully entered Victim's property and therefore were initial aggressors without considering that an officer may be an initial aggressor when effecting an arrest pursuant to section 563.031.1(b) and section 563.046. However, as noted, this assertion of legal error is based on a misrepresentation of the trial court's findings and does not address the trial court's actual reason for finding that section 563.046 was inapplicable.

Even if we were to attempt to address Devalkenaere's confusing arguments regarding section 563.046 as best we can, they would nevertheless fail, as Devalkenaere makes no legitimate attempt to accurately portray the contents of section 563.046. Generally, an initial aggressor is not entitled to use force in defense of others unless that initial aggressor falls within an exception that makes the actor's use of force nevertheless justifiable. § 563.031.1. One such exception to this general rule is present if the initial aggressor "is a law enforcement officer and as such is an aggressor pursuant to section 563.046[.]" § 563.031.1(1)(b). As pertinent to the initial aggressor inquiry under section 563.031.1(1)(b), section 563.046.1 provides: "A law enforcement officer need not retreat or desist from efforts to effect the arrest, or from efforts to prevent the escape from custody, of a person he or she reasonably believes to have committed an offense because

39

of resistance or threatened resistance of the arrestee." Clearly this provision's applicability is limited to circumstances when the officer is making efforts to effect an arrest or efforts to prevent an escape from custody. As noted, Devalkenaere makes no attempt to establish error with the trial court's stated reason why the provision was inapplicable. The use of force under section 563.046.1 is subject to numerous other restrictions, which Devalkenaere's arguments ignore.[16] Section 563.046.2 provides that

---

[16] Section 563.046 provides in full:

1. A law enforcement officer need not retreat or desist from efforts to effect the arrest, or from efforts to prevent the escape from custody, of a person he or she reasonably believes to have committed an offense because of resistance or threatened resistance of the arrestee. In addition to the use of physical force authorized under other sections of this chapter, a law enforcement officer is, subject to the provisions of subsections 2 and 3, justified in the use of such physical force as he or she reasonably believes is immediately necessary to effect the arrest or to prevent the escape from custody.
2. The use of any physical force in making an arrest is not justified under this section unless the arrest is lawful or the law enforcement officer reasonably believes the arrest is lawful, and the amount of physical force used was objectively reasonable in light of the totality of the particular facts and circumstances confronting the officer on the scene, without regard to the officer's underlying intent or motivation.
3. In effecting an arrest or in preventing an escape from custody, a law enforcement officer is justified in using deadly force only:
(1) When deadly force is authorized under other sections of this chapter; or
(2) When the officer reasonably believes that such use of deadly force is immediately necessary to effect the arrest or prevent an escape from custody and also reasonably believes that the person to be arrested:
(a) Has committed or attempted to commit a felony offense involving the infliction or threatened infliction of serious physical injury; or
(b) Is attempting to escape by use of a deadly weapon or dangerous instrument; or
(c) May otherwise endanger life or inflict serious physical injury to the officer or others unless arrested without delay.
4. The defendant shall have the burden of injecting the issue of justification under this section.

40

an officer's use of physical force in making an arrest is not justified under section 563.046 unless the arrest is lawful or the law enforcement officer reasonably believes the arrest is lawful.[17]  Devalkenaere makes no attempt to address this requirement.  Further, the amount of force used must be objectively reasonable.  § 563.046.2.  There are additional limitations on the use of deadly force under section 563.046.  § 563.046.3.  Devalkenaere fails to make a legitimate attempt to address these limitations.[18]

Devalkenaere misrepresents the contents of section 563.046, fails to preserve his point on appeal with proper briefing, and fails to address the trial court's actual reason for concluding that section 563.046 was inapplicable.  He fails to establish legal error.

Point three is denied.

**Point Eight**

In his eighth point, Devalkenaere argues that he cannot be convicted of armed criminal action if his conviction for involuntary manslaughter was in error.  Because

---

[17] If an officer makes an arrest in a place where the officer is unlawfully present, the arrest is illegal.  *See State v. Hunt*, 451 S.W.3d 251, 262 (Mo. banc 2014) ("The lawfulness of the arrest was dependent on the lawfulness of the forced entry into the residence because if Deputy Hunt unlawfully entered, his very presence in the residence was illegal and so was the arrest.").

[18] In addition to misrepresenting the trial court's verdict, Devalkenaere also misrepresents the contents of section 563.046 as they pertain to deadly force.  To this court's dismay, Devalkenaere argues: "Section 563.046 permits police to use deadly force without retreat when engaging with someone who an officer reasonably believes has committed an offense, and who is resisting or threatening to resist the officer."  Section 563.046 clearly contains limitations on the use of deadly force under section 563.046.  *See* § 563.046.3.  When an officer argues that a use of deadly force was justified under section 563.046, a factual question arises regarding whether the officer reasonably believed such use of deadly force was necessary.  Nevertheless, Devalkenaere's arguments appear to construe section 563.046 in a manner which would allow a law enforcement officer to use deadly force whether or not the officer reasonably believes it is necessary.

Devalkenaere has failed to establish error with respect to his conviction for involuntary manslaughter, his arguments regarding his armed criminal action conviction also fail.

Point eight is denied.

## Conclusion

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.